1

U.S. DISTRICT COURT
PORTLAND, MAINE
RECEIVED AND FILED

UNITED STATES DISTRICT COURT

DISTRICT OF MAINE      2004 APR 19 P 1:07

BY_____
DEPUTY CLERK

UNITED STATES OF AMERICA, )
                         )
        Plaintiff        )
                         )
V.                       )          CRIMINAL ACTION
                         )     Docket No. 02-CR-127-P-C
JUAN NAVARRO,            )       SENTENCING HEARING
                         )
        Defendant        )


### TRANSCRIPT OF PROCEEDINGS

Pursuant to notice, the above-entitled matter came on for SENTENCING before the HONORABLE GENE CARTER, Senior District Judge, in the United States District Court, Portland, Maine, on the 22nd day of December, 2003, at 8:53 a.m.


APPEARANCES:

For the Plaintiff:      JONATHAN CHAPMAN, AUSA

For the Defendant:      WILLIAM MASELLI, ESQ.


THE REPORTING GROUP
Mason & Lockhart



INDEX OF PROCEEDINGS

Testimony:                                              Page

    Mr. Chapman                                          11

    Mr. Maselli                                          15

INDEX OF EXHIBITS

| Plaintiff's Exhibit No. | Description | Offered | Admitted |
|---|---|---|---|
| 1 | Letter from T. Darcy to W. Maselli | 8 | 8 |

```
 1                THE COURT:  Good morning, counsel.

 2                MR. CHAPMAN:  Good morning, Your Honor.

 3                MR. MASELLI:  Good morning, Your Honor.

 4                THE COURT:  The matter before the Court at this

 5      time, the determination of imposition of sentencing, is

 6      that of United States of America vs. Juan Antonio

 7      Navarro, Criminal No. 02-127-P-C.

 8                Counsel, please enter appearances for the record.

 9                MR. CHAPMAN:  Jonathan Chapman for the United

10      States.

11                MR. MASELLI:  William Maselli for Mr. Navarro,

12      Your Honor.

13                THE COURT:  Thank you.

14                Mr. Maselli, will you and Mr. Navarro come to the

15      podium, please.

16                Sir, your name is Juan Antonio Navarro; is that

17      correct?

18                MR. NAVARRO:  Yes, sir.

19                THE COURT:  And you're the defendant named in the

20      indictment in this case that's now before this Court,

21      are you not?

22                MR. NAVARRO:  Yes, sir.

23                THE COURT:  You're represented here this morning,

24      are you not, by your counsel William Maselli, Esq.?

25                MR. NAVARRO:  Yes, sir.
```

1          THE COURT:  And do you authorize Mr. Maselli to
2    act and to speak before you and on your behalf in all
3    respects throughout these proceedings?
4          MR. NAVARRO:  Yes, sir.
5          THE COURT:  Mr. Maselli, has this defendant
6    received a copy of the revised presentence
7    investigation report of October 23, 2003?
8          MR. MASELLI:  Yes, he has, Your Honor.
9          THE COURT:  And has he read that report himself in
10   its entirety?
11         MR. MASELLI:  Yes, he has.
12         THE COURT:  Are you satisfied he knows everything
13   contained in the report?
14         MR. MASELLI:  Yes, I am.
15         THE COURT:  Have you reviewed the report with him?
16         MR. MASELLI:  Yes, I have, Your Honor.
17         THE COURT:  Have you explained its contents to
18   him?
19         MR. MASELLI:  Yes, Your Honor.
20         THE COURT:  And have you answered all questions he
21   has directed to you about the meaning or significance
22   of any of the contents of the report?
23         MR. MASELLI:  Yes, Your Honor.
24         THE COURT:  Are you satisfied that he fully
25   understands everything contained in the report?

1          MR. MASELLI:  Yes, I am, Your Honor.

2          THE COURT:  And have you reviewed with him also

3     this court's procedural order entered on December 3,

4     2003?

5          MR. MASELLI:  Yes, Your Honor.

6          THE COURT:  And has he read that himself?

7          MR. MASELLI:  Yes, he has.

8          THE COURT:  In its entirety?

9          MR. MASELLI:  Yes.

10          THE COURT:  And have you explained to him each of

11     the six issues reserved for the determination at this

12     time?

13          MR. MASELLI:  Yes, Your Honor.

14          THE COURT:  And have you indicated to him that

15     issue number one, the determination of the correct drug

16     quantity for which the defendant shall be held

17     accountable is no longer contested?

18          MR. MASELLI:  Yes, Your Honor.

19          THE COURT:  And did he give you authority to so

20     agree?

21          MR. MASELLI:  Yes, Your Honor, he is in agreement

22     with that.

23          THE COURT:  And are you satisfied he understands

24     all of those issues laid out in that procedural order?

25          MR. MASELLI:  Yes, I am, Your Honor.

1            THE COURT:  Mr. Navarro, let me ask you, have you

2       read this revised presentence investigation report

3       yourself in its entirety?

4            MR. NAVARRO:  Yes, Your Honor.

5            THE COURT:  Are you satisfied you know everything

6       contained in it?

7            MR. NAVARRO:  Yes.

8            THE COURT:  And has Mr. Maselli explained it to

9       your satisfaction?

10           MR. NAVARRO:  Yes, Your Honor.

11           THE COURT:  In every respect?

12           MR. NAVARRO:  Yes, Your Honor.

13           THE COURT:  And has he answered all of your

14      questions that you've directed to him about the meaning

15      or significance of the contents of the report?

16           MR. NAVARRO:  Yes, Your Honor.

17           THE COURT:  And did you understand all of his

18      explanations and answers?

19           MR. NAVARRO:  Yes, Your Honor.

20           THE COURT:  Are you satisfied that you fully

21      understand all of the contents of the report?

22           MR. NAVARRO:  Yes, Your Honor.

23           THE COURT:  And do you understand the procedural

24      order of December 3?

25           MR. NAVARRO:  Yes, Your Honor.

1           THE COURT:  Have you read that yourself in its

2      entirety?

3           MR. NAVARRO:  Yes, Your Honor.

4           THE COURT:  That's the order that sets forth the

5      six issues that were then, as of that time, preserved

6      for determination by me here today?

7           MR. NAVARRO:  Yes, Your Honor.

8           THE COURT:  And do you understand that there is no

9      longer any dispute about the drug quantity that's going

10     to be attributable to you?

11          MR. NAVARRO:  Yes, Your Honor.

12          THE COURT:  And is that with your consent and

13     authorization, that that --

14          MR. NAVARRO:  Yes.

15          THE COURT:  -- objection was withdrawn?

16          MR. NAVARRO:  Yes, Your Honor.

17          THE COURT:  Mr. Maselli, just so the record is

18     entirely clear, I understand that there's no objection

19     to my decision to decline to impose the enhancement and

20     the offense level for possession by co-conspirators of

21     a firearm in the course of the conspiracy; is that

22     true?

23          MR. MASELLI:  There is no objection of your

24     declining to do so.

25          THE COURT:  That's correct?

1              MR. MASELLI:  Yes, that is correct, Your Honor.

2          THE COURT:  And that you preserve your objection

3      with respect to the adjustment for his role in the

4      offense under Section 3B1.1(b)?

5              MR. MASELLI:  Yes, Your Honor.

6          THE COURT:  Very well.  You may be seated.

7              MR. MASELLI:  Thank you, Your Honor.

8          THE COURT:  Mr. Maselli, do you wish to present

9      any evidence?

10             MR. MASELLI:  No, Your Honor.  I would refer to

11     some transcript testimony.

12         THE COURT:  But there wasn't a letter that you

13     were going to --

14             MR. MASELLI:  Oh.  Your Honor, relative to the

15     criminal history category, we would offer Defendant's

16     Exhibit No. 1.

17         THE COURT:  Is there any objection?

18             MR. CHAPMAN:  There is no objection, Your Honor.

19         THE COURT:  It's admitted into evidence without

20     objection.

21             The record will reflect that this is a letter to

22     Mr. Maselli from Thomas Darcy, the Director of

23     Community Services at the Commonwealth of

24     Massachusetts, Executive Office of Health and Human

25     Services, Department of Youth Services for the Western

1       Area office.  It does not appear to bear a date I

2       guess.

3               When did you receive this?

4               MR. MASELLI:  This was received in my office last

5       week, Your Honor.

6               THE COURT:  And that was in response to your

7       efforts to determine the status of his juvenile history

8       record?

9               MR. MASELLI:  Yes, Your Honor.  And at the top

10      left-hand corner there is a fax received date of

11      December 12th.

12              THE COURT:  December 12th of this year?

13              MR. MASELLI:  Yes.

14              THE COURT:  Thank you.  Submitted into evidence.

15              Has counsel decided who wishes to go first at this

16      point?

17              MR. CHAPMAN:  Whatever Mr. Maselli pleases and

18      whatever the court wishes.

19              THE COURT:  I'll hear from the government and then

20      hear from you.

21              MR. MASELLI:  That's fine, Your Honor.  Thank you.

22              MR. CHAPMAN:  Your Honor, just to close the loop

23      on that exhibit that was just admitted, as I understand

24      it, that has the effect of removing the criminal

25      history points that are described in Paragraphs 31, 32,

1   and 33, because this exhibit shows that the

2   defendant -- that those convictions did not occur and

3   the sentences did not extend into the five-year limit

4   window that's required by the guidelines.

5       THE COURT:  That is correct.  As I indicated at

6   the prehearing conference we had this morning, after

7   conferring with the probation officer who had seen this

8   document over the weekend, that I proposed to find that

9   criminal history points assessed in the revised report

10  at Paragraphs 31, 32, and 33, totaling six in number,

11  do not -- should not -- should properly not be counted

12  because under 4A1.2(d) the present offense was not

13  committed within five years of his release from custody

14  on those five offenses.

15      MR. CHAPMAN:  That is our understanding, Your

16  Honor.

17      THE COURT:  The letter indicates that he was

18  released back into the community on September 20, 1996,

19  which would have been more than five years previous.

20      MR. CHAPMAN:  Yes, Your Honor.

21      THE COURT:  Do you agree with that?

22      MR. CHAPMAN:  Yes.

23      THE COURT:  Mr. Maselli?

24      MR. MASELLI:  Yes, Your Honor.

25      THE COURT:  And on that basis I intend to

1     determine that the criminal history category applicable

2     to this defendant for the purpose of this sentence is

3     criminal history Category 1.

4          MR. CHAPMAN:  Your Honor, let me start by

5     addressing the role in the offense issue that has been

6     preserved.  The probation officer has recommended that

7     a three level enhancement in the offense level be added

8     pursuant to Guideline 3B1.1(b) because the defendant

9     managed the assets of the conspiracy and directed at

10    least one other participant, thereby making him a

11    supervisor -- I'm sorry, a manager or a supervisor, but

12    not a leader or organizer, in the offense conduct.

13    The record in this case supports that conclusion in any

14    number of ways.

15         The court obviously heard the testimony and could

16    come at that from a variety of angles, all of which

17    would support the probation officer's determination.

18    Let me just identify a couple from the record that I

19    suggest by way of example, not as an exhaustive list.

20    The -- with respect to the general workings of the

21    conspiracy, the general workings of the finances of

22    this conspiracy, that's an issue -- or a characteristic

23    that Mr. Storms has pointed out.  The evidence shows

24    that what Mr. Navarro would do, among other things,

25    during the heart of the period of the conspiracy, would

1     be to bring distributors here to Maine or the, as we've

2     been referring to them, the Dominican gentlemen who

3     would stay at the trailer, would assess the financial

4     situation, the amount of cash that was available, take

5     steps that were necessary to ensure the financial

6     viability of the operation, and then take that money

7     back to the parent suppliers down in Massachusetts.

8          The court will recall one fairly striking instance

9     in the record, the testimony of Jorge Marques, when he

10    described one time when Navarro arrived at the trailer,

11    he went into the back room with some other individuals,

12    the Dominican gentlemen.  He heard Mr. Navarro

13    apparently being worked up and angry, came out,

14    threatened Dale McLean saying he wanted the money, he

15    needs the money, he better come up with the money or

16    else Crystal McLean would be kidnapped and would be

17    held for ransom.  That, to our way of thinking, is the

18    essence of managing the assets or the proceeds of a

19    drug organization.  That is, making sure that the money

20    is there for the suppliers down in Massachusetts.

21         Other examples of Mr. Navarro's management or

22    supervision of the organization came from Deborah

23    Schrock's testimony.  The court may recall that at

24    about the time that the person referred to as Ru and

25    Birkbeck were the distributors, Navarro came to Maine

1       and told Deborah Schrock that what was going to happen

2       was that he was going to bring -- start bringing those

3       Dominican men who would then live there.  Again, him

4       directing Deborah, who is a retail distributor,

5       directing her that that's what was going to occur and

6       directed her to keep everything safe with respect to

7       the drug business.  Again, that is Deborah Schrock's

8       testimony.  I think the court can find that that was

9       highly credible testimony and that it on its face, or

10      that under any analysis, that shows that the defendant

11      was directing the activities of the organization.

12          In other trial evidence, again, Deborah Schrock

13      testified that Mr. Navarro directed her to have the

14      Dominican men stay in the back room, that she would

15      tend to business in the front room and directed her to

16      make sure that they stayed in the back room and out of

17      sight.

18          So, Your Honor, I call the court's attention to

19      those facts by way of example.  The record as a whole

20      demonstrates, we think, without any question, that

21      Mr. Navarro was the manager or supervisor of this

22      operation and that it involved easily five or more

23      participants.

24          Your Honor, I think that that's the only remaining

25      guideline issue as such and what remains is the issue

1        of where within the guideline range to impose the

2        sentence in this case.  This is one of those cases in

3        which as a prosecutor there's not an awful lot more

4        that I can say at this point and not an awful lot that

5        I can add to be helpful to the court.  The court is

6        thoroughly familiar with the record in this case, heard

7        the trial in this case, but also has sentenced

8        virtually all of the other defendants.  And there's not

9        much I can do to add to the court's understanding,

10       other than perhaps to, again, refer to the parts of

11       the record that demonstrate that this defendant was

12       fully willing and able to communicate threats when

13       necessary -- when that's what was necessary to carry

14       out the ends of this drug organization.

15            Some of the testimony in this case was, at the

16       risk of overstating it, was chilling.  And Deborah

17       Schrock's testimony about being told by Juan Navarro

18       that she would be shot in the back of the head if she

19       became a rat, the explicit testimony about Crystal

20       McLean in which Mr. Navarro communicated a threat to

21       kidnap her, to hold her as ransom over her father's

22       drug debt, the evidence about the large amounts of

23       crack cocaine that was involved in this conspiracy, and

24       the absence of any suggestion that the defendant has

25       accepted responsibility, has -- is contrite in any way

1   or is anything other than an unreformed drug

2   trafficker.

3        The guideline range in this case calls for a

4   sentence that is very lengthy.  As I understand it,

5   it's 262 to 327 months.  That's a range that gives the

6   court the ability to impose a sentence that takes into

7   account all the things that I have identified.  And,

8   so, it's simply left for us to suggest to the court

9   that it impose an appropriate sentence within that

10  guideline range.

11       THE COURT:  Thank you.

12       Mr. Maselli?

13       MR. MASELLI:  Thank you, Your Honor.  To address

14  first the issue of the management role, there certainly

15  is evidence in the record to suggest that there is

16  support for the recommendation of the probation

17  department for this enhancement; however, I would also

18  suggest to the court that there is significant evidence

19  as to the contrary.  And I think that in such a

20  substantial enhancement factor that brings this

21  sentencing range up by over five years, that it is a

22  very important burden -- or I think that the court

23  should only impose this enhancement if it is fully

24  satisfied that all of the trial evidence supports this.

25  And I think, first of all, clearly knowing the

1    background of this case, the defendant was not the

2    leader of this.  And I think it's important to

3    understand that this was his uncle that was, in fact,

4    leading this.  And it puts into some context

5    Mr. Navarro's participation in what went on here.

6        The testimony of Deborah Schrock McLean,

7    Transcript 11, clearly identifies Rufino Jimenez as

8    having rented the apartment and made the initial

9    arrangements.  James Birkbeck testified in Transcript

10   98 that Juan Navarro was translating over the telephone

11   for his uncle, Big Tony, who was clearly the one

12   arranging things and making decisions and Mr. Navarro

13   was just somebody translating and following these

14   things.

15       I think it's critical to note that no one in the

16   conspiracy on the Massachusetts end in this trial ever

17   identified Juan Navarro as being somehow in control of

18   any of them.  Manolo Feliz Terrero testified that,

19   also known as Raul, testified in Transcript 133, that

20   he made five, six trips to Maine.  He was accompanied

21   by Mr. Navarro only one time.  Other times he was

22   accompanied by a Tito, a Papo, and a Yoshi.  He was

23   asked who was the owner of the cocaine in Transcript

24   136.  He identified the owner as Jorge Mattos.  He was

25   asked who directed your activities -- so taking it one

1    step down from Jorge Mattos, who directed your

2    activities, he said Janci Feliz.  He said he never got

3    cocaine from Juan Navarro, Transcript 143.  He said he

4    never gave any money to Juan Navarro, Transcript 144.

5    This is someone that's intimately involved in the

6    activities here, and there was no reason to -- if

7    anything, to help himself he's got a reason to

8    exaggerate the role of Juan Navarro because he was the

9    only one there on trial.

10        Also, Maurice, known as Papo, when asked who are

11    the bosses on Transcript 23 of his testimony, said

12    Jorge Mattos and Janci Feliz were the bosses of this

13    conspiracy.

14        So I think that even though there is evidence to

15    support this, there is also contrary evidence to place

16    Juan Navarro as just completely in the mix of the

17    people that were just coming and going.  I think if

18    you've got people that are actually selling the drugs

19    and when they run out of the drugs you call and say now

20    we're out, can you bring some more, if this is

21    testimony that is accepted by the court as to what

22    occurred here and Juan Navarro to become involved in

23    that, they are really directing Juan Navarro to come

24    and bring some cocaine.  It's hard to see how he's

25    managing their activities when they're calling him and

1       saying we're out of cocaine, bring us some more.

2           I think there's a lot of factors here that would

3       direct the court against giving this a substantial

4       aggravating role in this case.  So -- and especially,

5       finally, the influence of who is really the boss in

6       this case, Mr. Navarro's uncle.  So we would ask the

7       court to not give this three point enhancement, that to

8       at least consider the possibility of increasing only by

9       two levels rather than three levels here or not

10      increasing -- not using the enhancement at all.

11          Relative to the final sentence, depending upon

12      where the court ultimately decides to go, I'm assuming

13      that we're talking a 262 range.  This is a very, very

14      extreme sentencing range for a young man, 23 years old.

15      I think it is important, although he has had some

16      experience in the criminal justice system, he has had

17      nothing -- no convictions since his juvenile

18      convictions from the ages of 14 and 15.  He was on

19      probation for an extended period after having been

20      revoked, having been in a mutual fight with a number of

21      individuals which related to people that Mr. Navarro

22      was trying to stay away from at that time.  And that

23      was what violated his probation.  After he was released

24      from serving approximately two months of incarceration,

25      there was no further criminal activities.  And there

1   have been no further criminal convictions since this

2   conspiracy.

3       So you're looking at someone who has -- although

4   he has had experience in the criminal justice system

5   and clearly was a player here and clearly the evidence

6   supports -- the trial evidence supports that he was a

7   player here, his criminal involvement for someone

8   between the ages of 16 and 23 -- 22, was not

9   significant and hardly -- these are prime time years

10  for criminal activity; and you don't have that kind of

11  a background for Mr. Navarro.

12      During this time period he's helping to raise four

13  children, two of his own and two of his wife's

14  children.  I think Mr. Navarro is just a boy who was

15  clearly over his head in this situation.  He was being

16  directed by a family member as what to do.  He had no

17  idea of the kind of consequences he was looking at for

18  being involved in this activity, nor the obvious

19  likelihood that he was going to be caught.  His

20  involvement was so stupid that he actually came down

21  here and appeared himself at the federal detention

22  proceeding that other people were being held in

23  detention and he just shows up when he's supposedly one

24  of the organizers of this, but he's clearly -- the

25  evidence shows he's right in the middle of it.  He has

1       no conception of what he's doing.  And I think that's a

2       very big difference than somebody who is really a

3       mastermind of a situation and knows exactly what's

4       going on.

5           When he was arrested here, he was weeping for

6       extended periods of time, that he's not the guy, he

7       can't be arrested, what's going on he said.  He's

8       clearly not in touch with reality of a criminal

9       enterprise to be sitting here weeping in the detention

10      area of the Marshal's Office when he shows up with

11      other people that clearly were involved with him in

12      detention surrounded by federal agents where he could

13      be easily identified.  There's no sense of what's going

14      on at all.

15          Mr. Navarro grew up without a father in a very big

16      family in an environment with a lot of gang related

17      activity.  And the severely -- or seriously mitigating

18      circumstance here, Your Honor, I would say is that

19      without a father it was his uncle that played a large

20      role in raising him, that also brought him into this

21      situation, and that it was a misplaced sense of loyalty

22      to his uncle that has caused him in many ways to not

23      take the route that many other people have done in this

24      case and who are doing a very small amount of time

25      relating to what Mr. Navarro is looking at.  I think

1       although the guideline range --

2           THE COURT:  Well, the other sentences were

3       significant sentences.  They were not very small

4       amounts of time.

5           MR. MASELLI:  No, that's -- yes, I would rephrase

6       that, Your Honor.  Significantly less than what

7       Mr. Navarro is looking at.

8           And that was a route that Mr. Navarro understood.

9       He had a way to go and he was in a situation where he

10      had a father figure that was involved in this case.

11      And Mr. Navarro's background and the type of family

12      relationships that they have, I think it's more

13      difficult and a more intense decision than for someone

14      from a different cultural background to make the

15      decision, that this person has obviously led him on a

16      bad path and doesn't owe him any allegiance.  I think

17      that culturally that's a little bit more serious for

18      Mr. Navarro to make that step.

19          Although the court has a significant sentencing

20      range to go upward from the bottom of the guideline

21      range, I suggest to the court that what is here at the

22      bottom of the guideline range is more than adequate,

23      it's seriously more than adequate, to suit the purposes

24      of sentencing that the Congress has identified and to

25      take into effect Mr. Navarro's background and his age

1    and his complete emotional immaturity in terms of what
2    has been shown by his conduct throughout this event.
3    So we would ask the court, considering the age of his
4    children, the fact that he just wants to get back to
5    his life -- he understands what he has done -- and to
6    have mercy for Mr. Navarro under these circumstances
7    and to recognize that the sentence at the low end of
8    the guidelines here is a highly significant sentence
9    for a young man to face.  Thank you very much.
10        THE COURT:  Any response?
11        MR. CHAPMAN:  No, Your Honor.
12        THE COURT:  Mr. Navarro, as a defendant before the
13   court for the determination and imposition of sentence,
14   you have a right to address the court personally if you
15   have anything you wish to say to me that might affect
16   the determination of sentence.  And I invite you to
17   exercise that right if you wish to do so at this time.
18   If you have something to say, would you please come to
19   the podium.
20        MR. NAVARRO:  I'm sorry for being in this
21   situation, and I'm sorry I have to put my kids and my
22   mother through this.  Other than that, my attorney
23   spoke more clearly about everything else.  Thank you.
24        THE COURT:  Thank you.  You may be seated.
25        The court has a long and a familiarity of the

1       facts in this case, presided at trial, and has reviewed
2       carefully the revised presentence investigation report
3       in this case.  It's also knowledgeable about the
4       presentence investigation reports in the cases of the
5       co-defendants and Mr. Jorge Marques, who was a
6       participant but not a coindictee with respect to this
7       conspiracy.  And I take the context of this revised
8       presentence report, the record made at trial, I've
9       heard from counsel in these sentencing proceedings at
10      various times and take into account in determining the
11      sentence to be imposed here, as well as the provisions
12      as they are pertinent of the sentencing guidelines and
13      provisions of statutory law that bear upon the
14      determination of the sentence.

15              There is no plea agreement in this case.  The
16      court will enter in due course its written memorandum
17      of sentence which will set forth comprehensively and
18      precisely its findings of fact and conclusions of law
19      which provide the predicate for determining the
20      applicable elements of the sentence under the
21      guidelines and the statutes.  That memorandum will
22      reflect that the court finds that the defendant's
23      criminal activity involved 313 grams of cocaine base.
24      That determination is made without objection from the
25      parties, and it yields the base offense level of 36.

1       The memorandum will specify the basis on which that
2       amount is commuted.  Basically it is by the application
3       of a formula used as in the other -- in the case of the
4       other defendants sentencings of 112 days of
5       participation by this defendant in this conspiracy
6       times an average of 35 rocks per day distributed in the
7       course of the conspiracy with a weight of 1.8 grams
8       each, plus an additional 108 grams that was present at
9       the time of the police raid.  That yields the total
10      figure of 313 grams.

11      The memorandum will reflect that the court finds
12      without objection that a .22 caliber firearm was found
13      in a bedroom where the drugs involved, the offense
14      conduct, were located.  And that the Court further
15      finds, also without objection, that there is no
16      evidence that this defendant was directly involved in
17      the possession of that firearm, that he had any
18      knowledge of its possession by co-conspirators, or that
19      he should have reasonably foreseen that a
20      co-conspirator would possess the firearm in the course
21      of the offense conduct.  And the memorandum will
22      reflect it for that reason -- or for those reasons.
23      The court declines to enhance the offense level of this
24      defendant for possession of a firearm.
25      The memorandum will reflect that the court finds

1       that this defendant did manage the assets of the

2       conspiracy in a significant extent and that he directed

3       at least one other participant in the offense conduct

4       and that he was a manager or supervisor in a criminal

5       activity involving five or more participants and that

6       the court concludes that pursuant to Section 3B1.1(b)

7       the offense level is increased by three levels to Level

8       39.

9           I've carefully considered the record at trial in

10      this case.  I credit fully the testimony of Ms. Schrock

11      and of Mr. Marques, as well as the other witnesses

12      called by the Government.  But those two witnesses are

13      critical to showing that there was an overt exercise by

14      this defendant of management over the activities of

15      other participants in the conspiracy.  It's clear from

16      the record generally that, and established my view

17      beyond any reasonable doubt, but certainly by a

18      preponderance of the evidence standard, that this

19      defendant controlled the resources of this conspiracy

20      and the offense conducted pursuant to it.  That is,

21      with respect to both the drugs and the drug quantities

22      and with respect to the monies generated by the

23      distribution and the trafficking in those drug

24      quantities.  It's clear that the Dominican personnel

25      who came to Maine, supervised and controlled the

1       activities of the local Maine people involved in the
2       conspiracy, were sent by him, that they were under his
3       directions, that they responded to his directions.
4       They had detailed instructions from him as to how they
5       were to perform and what supervision and what level of
6       supervision they were to provide and that they did as
7       they were told by him and that on occasion he came to
8       Maine to make sure that they were doing that.  And on
9       two occasions, as referred to by Mr. Chapman on his
10      comments on sentencing, he came to Maine himself to
11      make sure that his direction and control was manifest
12      and exercised as he wished to have it done,
13      specifically in respect to obtaining the monies that he
14      believed was due from the drug trafficking activities
15      and threatening the wellbeing of Crystal McLean who was
16      not shown prior to that time to be a participant at any
17      level in the activities of the drug conspiracy, but
18      used her as a foil to coerce compliance with Dale
19      McLean, who was suspected at least, perhaps reasonably
20      so, of consuming some of the cocaine himself instead of
21      distributing it and not paying for it.  And to make
22      sure that all of the funds derived by the local Maine
23      participants in the conspiracy were turned over as this
24      defendant insisted and required to the Dominican
25      personnel, that he had dispatched them for the purpose

THE REPORTING GROUP
Mason & Lockhart

1       of delivering the cocaine, receiving funds, and

2       returning the funds to him or others in Massachusetts.

3       On that basis the court finds that there is an adjusted

4       offense level of 39.

5            The memorandum will reflect that the court further

6       finds that the defendant is not eligible to have the

7       base offense level decreased under Section 3B1.1(a) and

8       (b) for acceptance of responsibility.  The Court

9       finding the defendant has not accepted responsibility

10      for the offense of conviction.  He proceeded to trial,

11      the Government to its burden of proof, and he has been

12      throughout unrepentant and uncontrite by my own

13      observation.

14           The Court concludes that the defendant's adjusted

15      total offense level is 39 and that his criminal history

16      category is Category 1, not Category 3 or 4 I think it

17      was -- was it 3 or 4 in the report?

18           MR. CHAPMAN:  4, Your Honor.

19           THE COURT:  4.

20           That it is Category 1 rather than Category 4.

21      Since the report was prepared, Mr. Storms and the court

22      and counsel have been provided with Defendant's Exhibit

23      1, which reflects the true date.  I am satisfied of

24      defendant's release from custody on his juvenile

25      convictions and that that date means that the criminal

1    history points assessed for the conviction specified in

2    Paragraphs 31, 32, and 33 of the report are not

3    properly to be counted against him and that he,

4    therefore, falls into criminal history Category 1

5    rather than the one that was originally postured by the

6    report.

7        The memorandum will reflect that the court finds

8    the facts to be set out in the factual paragraphs of

9    the report to which no objection has been taken.

10   Counsel has advised the court that there's no dispute

11   as to the facts as stated in those paragraphs. It will

12   reflect that on these predicates the applicable

13   guideline range as determined by the court is to be 262

14   to 327 months. It will reflect that the court finds

15   that a term of five years of supervised release is

16   required for future protection of the public and to

17   maximize this defendant's potential for rehabilitation

18   once released from incarceration and that it is, in

19   fact, mandated by the applicable statute.

20       The memorandum with reflect that the court

21   concludes without objection that the defendant is not

22   eligible for admission of probation, that the fine

23   range for the offense conduct is $25,000 to $4 million,

24   and that this defendant is not able and even with the

25   use of a reasonable installment schedule is not likely

1    to become able to pay all or any part of any fine.

2    Accordingly, without objection from the Government, it

3    waives all fines, the court finding no alternative

4    sanction to be available for imposition of such fines.

5          The memorandum will reflect that restitution is

6    not involved in the case, that there is no need to

7    justify departure from the guideline range, neither

8    party requesting such departure.

9          If you'll stand, please, Mr. Navarro.

10          Pursuant to the Sentencing Reform Act of 1984, it

11    is hereby adjudged that on the indictment herein this

12    defendant, Juan Antonio Navarro, be and he is hereby

13    committed to the custody of the United States Bureau of

14    Prisons to be imprisoned for a term of 300 months.  The

15    court intends that the defendant receive credit for any

16    time he spent in federal presentence detention.  It's

17    further adjudged that upon release from imprisonment,

18    the defendant should be placed on supervised release

19    for a term of five years on usual terms and conditions

20    that apply in this district and on the three special

21    terms and conditions that will be specified precisely

22    in the memorandum.  Those have all been exposed to

23    counsel in the presentence conference, and I understand

24    there's no objection to any of them.

25          Is that correct, Mr. Maselli?

1        MR. MASELLI:  Yes, Your Honor.

2        THE COURT:  The Court orders that all fines in the

3    case be and they are hereby waived.  The Court hereby

4    orders that no assessment be made against this

5    defendant to pay or reimburse for cost of his

6    incarceration.  It's further ordered that the defendant

7    will pay forthwith to the United States a special

8    assessment as required by statute of $100.

9        You may be seated.

10        The reasons for the sentence are that this was a

11    most significant conspiracy in terms of the drug

12    trafficking activities alone.  It injected a huge

13    quantity of cocaine base into an area of Maine that

14    imposed upon the lives of a number of local Maine

15    people to the extent of at least increasing their

16    exposure to the use of cocaine base.  In the case of

17    Dale McLean, it reduced him in the force of this

18    conspiracy.  And he's not at all without fault in that

19    respect.  This conspiracy provided the opportunity for

20    him to have access to the amounts of cocaine which

21    reduced him to a physical and mental wreck and made

22    possible his being coerced, to a large extent, by this

23    defendant and his Dominicans sent to Maine and to act

24    pursuant to the conspiracy conduct, along with Deborah

25    Schrock.  So it's a very significant drug conspiracy

THE REPORTING GROUP
Mason & Lockhart

1    activity that we have involved here.

2         And then the second factor that's of concern to me

3    is that it was done in a way that manifested completely

4    an arrogant and malicious attitude toward the wellbeing

5    of others.  It was a willingness to exercise with the

6    consent, and sometimes at the persuasion of this

7    defendant, threats of force in a very telling and

8    meaningful manner.  There was the placing in jeopardy

9    of the wellbeing, if not the life, of Crystal McLean,

10   who was really an innocent bystander, in that she was

11   simply the daughter of Dale McLean.  And the fact that

12   Jorge Marques, who had no active involvement in the

13   conspiracy, and terrible threats were made against

14   Crystal because of his romantic attachment to and the

15   welfare of Crystal McLean, then became involved in this

16   conspiracy and by that became exposed to a significant

17   term of incarceration, which I'm satisfied from the

18   record he probably would not have done -- in all

19   probability would not have been exposed to except for

20   the threats made against Crystal McLean.

21        So it affected many lives in a very adverse way

22   within the conspiracy itself.  It involved violence.

23   It involved intimidation.  It was all done at the

24   instigation at the local level by this defendant.  I

25   think the record clearly shows that he acted, in part

1     at least, as the emissary of his uncle, Mr. Mattos.

2     But that does not mean that he should not properly be

3     held accountable for his leadership activities and the

4     seriousness of those activities in the course of seeing

5     that the conspiracy was executed in a manner that was

6     favorable to the services of Mr. Mattos.

7     For those reasons, I think the guidelines -- the

8     sentence for hearing falls within the guideline range

9     and which is recommended by the government is

10     appropriate, and I conclude that the 300 months

11     sentence that has been proposed is an appropriate

12     recognition of the seriousness of the offense as

13     reflected by the guidelines and of the need to impose

14     significant penalties, which particularly lies with the

15     general deterrence in order to provide significant

16     opportunity for the rehabilitation of this defendant.

17     This defendant is hereby remanded for and in the

18     custody of a United States Marshal for the District of

19     Maine and execution of the incarceration term of the

20     sentence just imposed.

21     I must advise you, Mr. Navarro, that you have a

22     right to appeal this sentence if you wish to do so. Do

23     you understand that?

24     MR. NAVARRO: Yes, I do.

25     THE COURT: I didn't hear your answer.

1      MR. NAVARRO: Yes, I do.

2      THE COURT: And I must advise you that in order to

3      effectively exercise that right of appeal, you must

4      cause to be filed with the clerk of this court within

5      10 days of today and not thereafter a written notice of

6      appeal. Do you understand that?

7      MR. NAVARRO: Yes, I do.

8      THE COURT: And I advise you that if you fail to

9      timely file that written notice of appeal, you will

10     lose forever your right to appeal this sentence or your

11     conviction. Do you understand that?

12     MR. NAVARRO: Yes, I do.

13     THE COURT: Do you understand that you have to

14     file that notice of appeal in order to appeal your

15     conviction as well to appeal your sentence?

16     MR. NAVARRO: Yes, I do.

17     THE COURT: So I advise you that if you wish to

18     appeal anything, you let Mr. Maselli know promptly so

19     he can file it in a timely manner. Do you understand

20     that?

21     MR. NAVARRO: Yes, I do.

22     THE COURT: Anything further from the Government?

23     MR. CHAPMAN: No, Your Honor.

24     THE COURT: From the defendant?

25     MR. MASELLI: No, Your Honor. Thank you.

1           THE COURT:  Thank you.  Court will be in recess

2     and the defendant will be in the custody of the

3     officers.

4                  (The sentencing hearing was concluded at

5     9:38 a.m.)

6                        * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATION

 2              I certify that the foregoing is a correct

 3         transcript for the record of proceedings in the

 4         above-entitled matter.

 5

 6         _____        4-16-04
           Laurel A. Long                   Date
 7         Court Reporter

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

THE REPORTING GROUP
Mason & Lockhart